FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2015 JAN 12 AM 9:03

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                                          ) DIVISION ONE

          Respondent, )

                                        ) No. 70298-0-I
            v. ) (linked with No. 70299-8-I)

LG ELECTRONICS, INC.;
KONINKLIJKE PHILIPS
ELECTRONICS N.V. a/k/a ROYAL
PHILIPS ELECTRONICS N.V.;
PHILIPS ELECTRONICS INDUSTRIES
(TAIWAN), LTD.; SAMSUNG SDI CO.,
LTD. f/k/a SAMSUNG DISPLAY
DEVICE CO., LTD.; SAMSUNG SDI
AMERICA, INC.; SAMSUNG SDI
MEXICO S.A. DE C.V.; SAMSUNG SDI ) PUBLISHED OPINION
BRASIL LTDA.; SHENZHEN
SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.;
SAMSUNG SDI (MALAYSIA) SDN.
BHD.; PANASONIC CORPORATION
f/k/a MATSUSHITA ELECTRIC
INDUSTRIAL CO., LTD.; HITACHI
DISPLAYS, LTD.; HITACHI
ELECTRONIC DEVICES (USA), INC.;
HITACHI ASIA, LTD.,

         Appellants,

LG ELECTRONICS U.S.A., INC.;
PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION; TOSHIBA
CORPORATION; TOSHIBA AMERICA
ELECTRONIC COMPONENTS, INC.;
MT PICTURE DISPLAY CO., LTD.;
PANASONIC CORPORATION OF
NORTH AMERICA; HITACHI, LTD.;

No. 70298-0-I (linked with No. 70299-8-I)/2

CHUNGHWA PICTURE TUBES LTD.;    )
CPTF OPTRONICS CO., LTD.;         )
CHUNGHWA PICTURE TUBES           )
(MALAYSIA) SDN. BHD.,             )
                                 )
                 Defendants.     )    FILED:  January 12, 2015
_____  )

DWYER, J. — In resolving this appeal, which requires us to consider the due process limitations on the exercise of personal jurisdiction over certain foreign corporations, we hold that because a product manufactured by these foreign corporations was sold—as an integrated component part of retail consumer goods—into Washington in high volume over a period of years, the corporations "purposefully" established "minimum contacts" in Washington. Owing to our conclusion that the Attorney General alleged sufficient "minimum contacts" to support an exercise of specific jurisdiction by Washington courts, and in view of our further conclusion that such exercise would not offend notions of "fair play and substantial justice," we reverse the trial court's order dismissing the Attorney General's complaint for lack of personal jurisdiction and remand for further proceedings.

I

On May 1, 2012, the Attorney General,[1] acting on behalf of the State and as parens patriae on behalf of persons residing in Washington, brought suit

_____

[1] At the time that the complaint was filed, the Attorney General of Washington was Robert M. McKenna.  The current Attorney General is Robert W. Ferguson.

- 2 -

against more than 20 foreign corporate entities.[2] While geographically diffuse, the defendants had a common characteristic—past participation in the global market for cathode ray tubes (CRTs).[3] The Attorney General broadly alleged that the defendants had, in violation of the Washington Consumer Protection Act[4] (CPA), participated in a worldwide conspiracy to raise prices and set production levels in the market for CRTs, which caused Washington State residents and State agencies to pay supracompetitive prices for CRT products.[5]

The Attorney General claimed that the defendants manufactured, sold, and/or distributed CRT products, directly or indirectly, to customers throughout the United States and, specifically, in Washington. He further alleged that the actions of the defendants were intended to and did have a direct, substantial, and reasonably foreseeable effect on United States domestic import trade and commerce, and on import trade and commerce into and within Washington. Indeed, he averred that the defendants' alleged conspiracy to fix prices affected billions of dollars in United States commerce and damaged a large number of Washington State agencies and residents.

In support of this, the Attorney General maintained that because, until recently, CRTs were the dominant technology used in displays such as

---

[2] These entities were scattered across four continents and ten different countries, including South Korea, Taiwan, China, Japan, Malaysia, Singapore, the United States of America, Mexico, Brazil, and the Netherlands.

[3] A cathode ray tube is a display technology used in televisions, computer monitors, and other specialized applications. According to the Attorney General, CRTs, until recently, represented the "dominant technology for manufacturing televisions and computer monitors."

[4] Ch. 19.86 RCW.

[5] The Attorney General defined CRT products as "CRTs and products containing CRTs, such as televisions and computer monitors."

televisions and computer monitors, this translated into the sale of millions of CRT products during the alleged conspiracy period, which resulted in billions of dollars in annual profits to the defendants. The Attorney General alleged that during the entirety of the alleged conspiracy period, North America represented the largest market for CRT televisions and computer monitors, and that the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which were purchased in North America. The Attorney General claimed that CRT monitors accounted for over 90 percent of the retail market for computer monitors in North America in 1999 and that CRT televisions accounted for 73 percent of the North American television market in 2004. The Attorney General averred that during the alleged conspiracy period, the CRT industry was dominated by relatively few companies, and that, in 2004, four of the defendants in this case together held a collective 78 percent share of the global CRT markets.

By way of relief, the Attorney General sought (1) injunctive relief, (2) civil penalties, (3) damages for State agencies, and (4) restitution for consumers who purchased CRTs or CRT products, whether directly or indirectly.

After accepting service of process, and prior to any discovery being conducted, certain defendants (collectively Companies[6]) filed motions, supported by affidavits and declarations, to dismiss the Attorney General's complaint for lack of personal jurisdiction pursuant to CR 12(b)(2). These affidavits and

---

[6] Koninklijke Philips Electronics N.V., Philips Electronics Industries (Taiwan), Ltd., Panasonic Corporation, Hitachi Displays, Ltd., Hitachi Asia, Ltd., Hitachi Electronic Devices (USA), Inc., LG Electronics, Inc., Samsung SDI America, Inc., Samsung SDI Co., Ltd., Samsung SDI (Malaysia) SDN. BHD., Samsung SDI Mexico S.A. DE C.v., Samsung SDI Brasil LTDA., Shenzhen Samsung SDI Co., Ltd., and Tianjin Samsung SDI Co., Ltd.

declarations contained testimony that the Companies had never sold CRTs or CRT products to Washington customers or done any business in Washington.

In response, the Attorney General maintained that, for purposes of resolving the Companies' dispositive motions, the aforementioned affidavits and declarations should not be considered by the trial court. In the event that they were considered, however, the Attorney General requested an opportunity to conduct both general and jurisdictional discovery. The Companies opposed the Attorney General's request.

The trial court granted the Companies' motions and dismissed the Attorney General's complaint as against them. In doing so, the trial court denied the Attorney General's request to conduct discovery. Upon an agreed motion, the trial court entered final judgment with prejudice pursuant to CR 54(b).[7] The Attorney General filed a timely appeal.

Additionally, the trial court authorized the Companies to request attorney fees and costs. With the exception of the Philips entities, the Companies submitted briefing requesting fees, along with supporting affidavits. The trial

---

[7] **Judgment Upon Multiple Claims or Involving Multiple Parties**. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross claim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination in the judgment, supported by written findings, that there is no just reason for delay and upon an express direction for the entry of judgment. The findings may be made at the time of entry of judgment or thereafter on the court's own motion or on motion of any party. In the absence of such findings, determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

court granted their request for fees pursuant to RCW 4.28.185(5).[8] The Attorney General appeals from this award pursuant to RAP 2.4(g).[9]

Certain defendants[10] sought and obtained discretionary review of two issues related to whether certain claims of the Attorney General were time-barred. That matter has been resolved by separate opinion. State v. LG Electronics, Inc., No. 70299-8-I (Wash. Ct. App. Dec. 22, 2014). The underlying litigation has been stayed.

II

The Attorney General contends that the trial court's order dismissing his complaint for lack of personal jurisdiction over the Companies was entered in error. We agree. The allegations in the Attorney General's complaint, when treated as verities, are sufficient to satisfy his prima facie burden of showing that personal jurisdiction comports with due process considerations. Considered together, the Attorney General's allegations demonstrate the following: (1) that the Companies "purposefully" established "minimum contacts" with Washington, (2) that the harm claimed by the Attorney General "arose" from those minimum contacts, and (3) that the exercise of jurisdiction in this matter is consistent with

---

[8] This is the attorney fee provision of Washington's long-arm statute. It states that, "[i]n the event the defendant is personally served outside the state on causes of action enumerated in this section, and prevails in the action, there may be taxed and allowed to the defendant as part of the costs of defending the action a reasonable amount to be fixed by the court as attorneys' fees." RCW 4.28.185(5).

[9] "An appeal from a decision on the merits of a case brings up for review an award of attorney fees entered after the appellate court accepts review of the decision on the merits." RAP 2.4(g).

[10] LG Electronics, Inc., LG Electronics U.S.A. Inc., Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V., Philips Electronics North America Corporation, Toshiba Corporation, Toshiba America Electronic Components, Inc., Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Electronic Devices (USA), Inc., and Hitachi Asia, Ltd.

notions of "fair play and substantial justice."

A

Civil Rule 12 is entitled "Defenses and Objections." Section (b), entitled "How Presented," reads as follows:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross claim, or third party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, *(2) lack of jurisdiction over the person,* (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert at the trial any defense in law or fact to that claim for relief. *If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by rule 56.*

(Emphasis added.)

Thus, whereas CR 12 envisions the possibility that the submission of evidence by one party may cause a CR 12(b)(6) motion to be converted into a CR 56 motion, it does not, by its terms, envision the same for motions brought pursuant to subsection (b)(2).[11]

---

[11] "When interpreting court rules, the court approaches the rules as though they had been drafted by the Legislature." State v. Greenwood, 120 Wn.2d 585, 592, 845 P.2d 971 (1993).

Nevertheless, our case law does not prohibit the introduction of evidence in support of a motion brought pursuant to CR 12(b)(2). However, when this occurs prior to full discovery, neither CR 12(b) itself, nor controlling case law, provides that the motion be analyzed as if it were brought pursuant to CR 56. Instead, our case law sets out the particular requirements for evaluation of such a CR 12(b)(2) motion.[12]

"'When the trial court considers matters outside the pleadings on a motion to dismiss for lack of personal jurisdiction, we review the trial court's ruling under the de novo standard of review for summary judgment.'" Columbia Asset Recovery Grp., LLC v. Kelly, 177 Wn. App. 475, 483, 312 P.3d 687 (2013) (quoting Freestone Capital Partners LP v. MKA Real Estate Opportunity Fund I, LLC, 155 Wn. App. 643, 653, 230 P.3d 625 (2010)). When reviewing a grant of a motion to dismiss for lack of personal jurisdiction, we accept the nonmoving party's factual allegations as true and review the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. Freestone, 155 Wn. App. at 653-54; accord Walden v. Fiore, __ U.S. __, 134 S. Ct. 1115, 1119 n.2, 188 L. Ed. 2d 12 (2014). It is the plaintiff's burden to establish a prima facie case that jurisdiction exists. Freestone, 155 Wn. App. at 654; see also FutureSelect Portfolio Mgmt, Inc. v. Tremont Grp. Holdings, Inc.,

---

"The language must be given its plain meaning according to English grammar usage." State v. Raper, 47 Wn. App. 530, 536, 736 P.2d 680 (1987).

[12] After a fair opportunity for discovery, a party may, of course, bring a motion to dismiss for want of personal jurisdiction as a CR 56 motion. Similarly, if the facts are in dispute, and if there is not otherwise a right to have a jury determine the particular facts at issue, CR 12(d) provides for a determinative hearing on the matter prior to trial.

175 Wn. App. 840, 885-86, 309 P.3d 555 (2013) ("The plaintiff has the burden of demonstrating jurisdiction, but when a motion to dismiss for lack of personal jurisdiction is resolved without an evidentiary hearing," the plaintiff's burden is only that of a prima facie showing of jurisdiction), aff'd, 180 Wn.2d 954, 331 P.3d 29 (2014).

The Companies agree that review is de novo. However, they assert that the allegations in the Attorney General's complaint may not be treated as verities for purposes of determining personal jurisdiction. The Companies contend that when a defendant moves to dismiss for lack of personal jurisdiction and, in doing so, offers affidavits or declarations to rebut the allegations in the plaintiff's complaint, the plaintiff may not rely on the complaint's factual averments but, rather, must submit evidence in order to satisfy its burden of proof. Given that, in support of their motions to dismiss, the Companies offered sworn testimony controverting the Attorney General's allegations, they maintain that it was incumbent upon the Attorney General to offer evidence to substantiate his allegations.[13] The Companies' position, which is at variance with our prior decisions, is untenable.

Even where the trial court has considered matters outside the pleadings on a CR 12(b)(2) motion to dismiss for lack of personal jurisdiction, "[f]or purposes of determining jurisdiction, this court treats the allegations in the

---

[13] The Companies' position is based on the premise that, in a CR 56 context, the nonmoving party must produce evidence in support of its claims and may not merely rely on the allegations in its complaint or other pleadings. See Baldwin v. Sisters of Providence in Wash., Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989).

complaint as established." Freestone, 155 Wn. App. at 654; accord State v. AU Optronics Corp., 180 Wn. App. 903, 912, 328 P.3d 919 (2014); FutureSelect, 175 Wn. App. at 885-86; SeaHAVN, Ltd. v. Glitnir Bank, 154 Wn. App. 550, 563, 226 P.3d 141 (2010); Shaffer v. McFadden, 125 Wn. App. 364, 370, 104 P.3d 742 (2005); CTVC of Haw. Co. v. Shinawatra, 82 Wn. App. 699, 708, 919 P.2d 1243, 932 P.2d 664 (1996); Hewitt v. Hewitt, 78 Wn. App. 447, 451-52, 896 P.2d 1312 (1995); In re Marriage of Yocum, 73 Wn. App. 699, 703, 870 P.2d 1033 (1994); Harbison v. Garden Valley Outfitters, Inc., 69 Wn. App. 590, 595, 849 P.2d 669 (1993); MBM Fisheries, Inc. v. Bollinger Mach. Shop & Shipyard, Inc., 60 Wn. App. 414, 418, 804 P.2d 627 (1991); see also Raymond v. Robinson, 104 Wn. App. 627, 633, 15 P.3d 697 (2001) (Division Two); Precision Lab. Plastics, Inc. v. Micro Test, Inc., 96 Wn. App. 721, 725, 981 P.2d 454 (1999) (Division Two); Byron Nelson Co. v. Orchard Mgmt. Corp., 95 Wn. App. 462, 467, 975 P.2d 555 (1999) (Division Three). Our Supreme Court has recognized this approach and adopted the same. See FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 963-64, 331 P.3d 29 (2014) (standard applies when full discovery has not been conducted); Lewis v. Bours, 119 Wn.2d 667, 670, 835 P.2d 221 (1992).[14]

---

[14] We note the existence of two cases from the electric typewriter era that indicate to the contrary. Access Rd. Builders v. Christenson Elec. Contracting Eng'g Co., 19 Wn. App. 477, 576 P.2d 71 (1978) (Division One), and Puget Sound Bulb Exch. v. Metal Bldgs. Insulation Inc., 9 Wn. App. 284, 513 P.2d 102 (1973) (Division Two). In both cases, it appears that each party offered evidence and that neither plaintiff sought to have the court treat the allegations in its complaint as established. Neither case discusses the issue as presented herein and both, to the extent that they are inconsistent with recent precedent, have been overtaken by the previously cited, uniform authority from the Supreme Court and all three divisions of the Court of Appeals. Similarly, in Carrigan v. California Horse Racing Board, 60 Wn. App. 79, 802 P.2d 813 (1990), which cited to

Resolving jurisdictional matters at an early stage is an important objective;[15] yet, our liberal notice pleading system,[16] which allows plaintiffs to "use the discovery process to uncover the evidence necessary to pursue their claims," tempers this aspiration. Putman v. Wenatchee Valley Med. Ctr., P.S., 166 Wn.2d 974, 983, 216 P.3d 374 (2009);[17] cf. Bryant v. Joseph Tree, Inc., 119 Wn.2d 210, 222, 829 P.2d 1099 (1992) ("The notice pleading rule contemplates that discovery will provide parties with the opportunity to learn more detailed information about the nature of a complaint."); Mose v. Mose, 4 Wn. App. 204, 209, 480 P.2d 517 (1971) ("the notice pleading concept inherent in the rules anticipates that the issues to be tried will be delineated by pretrial discovery"). See generally FutureSelect, 180 Wn.2d at 963 ("At this stage of the litigation, the

---

Access Road Builders as authority for treating the motion to dismiss as a CR 56 motion, it does not appear that the plaintiff argued that the court should treat the allegations in the complaint as true.

In this matter, the trial judge did not purport to be holding the Attorney General to the standard of production that must be satisfied in order to withstand a CR 56 motion for summary judgment: "I don't mean that this is a summary judgment motion. I am not trying to convert this into a summary judgment motion." This disavowal indicates that the trial judge, in spite of his erroneous dismissal of the Attorney General's complaint, understood correctly that, in considering whether to dismiss the Attorney General's complaint for want of personal jurisdiction over the Companies, it was incumbent upon the court to treat as verities the averments contained therein.

[15] See, e.g., Sanders v. Sanders, 63 Wn.2d 709, 715, 388 P.2d 942 (1964) ("[W]hen jurisdictional problems are left unsettled while various other matters are presented . . . [t]he result is too often confusion, guess work and uncertainty, as well as probable delay, hardship and expense to the parties.").

[16] "Washington follows notice pleading rules and simply requires a 'concise statement of the claim and the relief sought.'" Champagne v. Thurston County, 163 Wn.2d 69, 84, 178 P.3d 936 (2008) (quoting Pac. Nw. Shooting Park Ass'n v. City of Sequim, 158 Wn.2d 342, 352, 144 P.3d 276 (2006)); accord CR 8.

[17] In Putman, our Supreme Court struck down a statute requiring medical malpractice plaintiffs to submit a certificate of merit from a medical expert prior to discovery, ruling that this requirement violated the plaintiffs' right of access to the court, which "'includes the right of discovery authorized by the civil rules.'" 166 Wn.2d at 979 (quoting John Doe v. Puget Sound Blood Ctr., 117 Wn.2d 772, 780, 819 P.2d 370 (1991)).

A simple rule emerges from Putman and the cases previously cited: If the defendant's motion to dismiss is to be decided by crediting the averments in the plaintiff's complaint, discovery is not required. However, if the defendant's motion to dismiss is to be decided based on evidence or the lack thereof, full and reasonable discovery must be afforded.

allegations of the complaint establish sufficient minimum contacts to survive a CR 12(b)(2) motion. . . . [The defendant] may renew its jurisdictional challenge after appropriate discovery has been conducted.") Were we to embrace the Companies' position, we would create a false world—one existing solely as the result of litigation strategies. Here, the Companies brought their CR 12(b)(2) motions, submitting factual averments therewith, prior to full discovery taking place. The Companies then successfully resisted the Attorney General's attempt to conduct discovery directed to the personal jurisdiction issue. This is a litigation strategy designed to subvert, rather than advance, the purpose of our liberal notice pleading regime—to facilitate a proper decision on the merits.[18] See Stansfield v. Douglas County, 146 Wn.2d 116, 123, 43 P.3d 498 (2002).

We need not disrupt our notice pleading regime in an effort to accommodate defendants following the invocation of a CR 12(b)(2) affirmative defense. In fact, accommodation has been made by rule. CR 12(d) permits any party to seek an evidentiary hearing prior to trial when "lack of jurisdiction over the person" has been raised as an affirmative defense pursuant to CR 12(b)(2): "[U]nless the court orders that the hearing and determination thereof be deferred until the trial," "[t]he defenses specifically enumerated (1)-(7) in section (b) of this rule . . . shall be heard and determined before trial on application of any party." CR 12(d). Following an evidentiary hearing, the plaintiff's burden is no longer that of a prima facie showing. Cf. FutureSelect, 175 Wn. App. at 885-86 ("when

---

[18] For this reason, were we to accept the Companies' position, we would be compelled to conclude that the trial court abused its discretion when it refused to permit the Attorney General to conduct jurisdictional discovery.

a motion to dismiss for lack of personal jurisdiction is resolved without an evidentiary hearing," the plaintiff's burden is only that of a prima facie showing).

In spite of this accommodation, it is apparent, given the Companies' litigation strategy—for instance, their opposition to the Attorney General's request that he be allowed to participate in general and jurisdictional discovery—that their objective has been to avoid engaging in discovery. While not unusual or inherently problematic, this objective—when pursued in a manner antithetical to the purpose of notice pleading and the structure of the Civil Rules—must be rebuffed. Accordingly, we decline to countenance the submittal of sworn testimony as a means of compelling plaintiffs to substantiate their allegations at the pleadings stage. Because the allegations in the complaint are treated as established, when a CR 12(b)(2) motion is made prior to full discovery, any individual allegation cannot be defeated by a statement to the contrary in a declaration submitted in support of the motion to dismiss.[19]

With this articulation of the proper standard of review accomplished, we proceed to set forth and examine in some detail the legal principles pertinent to the due process analysis conducted herein.

B

The Attorney General asserts specific personal jurisdiction over the Companies pursuant to RCW 19.86.160—the long-arm provision of the CPA:

---

[19] The effect of our decision is not to mandate that affidavits or declarations submitted in support of a motion to dismiss be henceforth stricken. We hold only that such submissions do not alter the manner in which we treat the allegations in the complaint.

> Personal service of any process in an action under this chapter may be made upon any person outside the state if such person has engaged in conduct in violation of this chapter which has had the impact in this state which this chapter reprehends. Such persons shall be deemed to have thereby submitted themselves to the jurisdiction of the courts of this state within the meaning of RCW 4.28.180 and 4.28.185.

This provision "extends the jurisdiction of Washington courts to persons outside its borders" and "'is intended to operate to the fullest extent permitted by due process.'" AU Optronics, 180 Wn. App. at 914 (quoting In re Marriage of David-Oytan, 171 Wn. App. 781, 798, 288 P.3d 57 (2012), review denied, 177 Wn.2d 1017 (2013)). Our "exercise of jurisdiction under RCW 19.86.160 must satisfy both the statute's requirements and due process." AU Optronics, 180 Wn. App. at 914. The Companies limit their jurisdictional challenge to the State's alleged attempt to violate due process.

A framework for analyzing whether Washington courts may exercise personal jurisdiction consistent with the Due Process Clause—derived from certain United States Supreme Court decisions discussed infra—has emerged.

> (1) That purposeful "minimum contacts" exist between the defendant and the forum state; (2) that the plaintiff's injuries "arise out of or relate to" those minimum contacts; and (3) that the exercise of jurisdiction be reasonable, that is, that jurisdiction be consistent with notions of "fair play and substantial justice."

Grange Ins. Ass'n v. State, 110 Wn.2d 752, 758, 757 P.2d 933 (1988) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-78, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)); accord Failla v. FixtureOne Corp., __ Wn.2d __, 336 P.3d 1112, 1116 (2014); FutureSelect, 180 Wn.2d at 963-64; AU Optronics, 180 Wn. App. at 914.

While this framework may serve as a useful analytical tool, given its derivation, its value is dependent upon ascertaining the manner in which the United States Supreme Court has applied the principles embodied therein. In recognition of this, we turn our attention to the United States Supreme Court's personal jurisdiction jurisprudence.

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." Walden, 134 S. Ct. at 1121. "'The canonical opinion in this area remains International Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945), in which [the United States Supreme Court] held that a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."'" Daimler AG v. Bauman, __ U.S. __, 134 S. Ct. 746, 754, 187 L. Ed. 2d 624 (2014) (internal quotation marks omitted) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, __ U.S. __, 131 S. Ct. 2846, 2853, 180 L. Ed. 2d 796 (2011)). "International Shoe's conception of 'fair play and substantial justice' presaged the development of two categories of personal jurisdiction," commonly referred to as "specific jurisdiction" and "general jurisdiction." Daimler, 134 S. Ct. at 754. Specific jurisdiction, which since "'has become the centerpiece of modern jurisdictional theory,'" requires that suit arise out of or relate to the defendant's contacts with the forum. Daimler, 134 S. Ct. at 754-55 (quoting Goodyear, 131 S. Ct. at 2854). General jurisdiction, which since

"'[has played] a reduced role,'" permits the exercise of personal jurisdiction over a nonresident defendant where the defendant's "'continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'" Daimler, 134 S. Ct. at 754-55 (alterations in original) (quoting Goodyear, 131 S. Ct. at 2854; Int'l Shoe, 326 U.S. at 318).[20]

"'[T]he constitutional touchstone' of the determination whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established "minimum contacts" in the forum State.'" Asahi Metal Indus. Co. v. Superior Court of Cal., Solano County, 480 U.S. 102, 108-09, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (plurality opinion) (alteration in original) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)); accord Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958). The minimum contacts "inquiry . . . 'focuses on "the relationship among the defendant, the forum, and the litigation."'" Walden, 134 S. Ct. at 1121 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)) (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)); accord Failla v. FixtureOne Corp., __ Wn.2d __, 336 P.3d 1112, 1116 (2014). Indeed, "[d]ue

---

[20] The United States Supreme Court has condemned the "'elid[ing]'" of "'the essential difference[s]'" between specific and general jurisdiction, observing that "[a]lthough the placement of a product into the stream of commerce 'may bolster an affiliation germane to *specific* jurisdiction,' . . . such contacts 'do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant.'" Daimler, 134 S. Ct. at 757 (quoting Goodyear, 131 S. Ct. at 2855, 2857). We are careful to note that our analysis herein is limited to determining whether specific jurisdiction may be exercised over the Companies.

process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." Walden, 134 S. Ct. at 1123 (quoting Burger King, 471 U.S. at 475). In view of this, "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum," but, "[r]ather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). Thus, it has been said that "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the *expectation* that they will be purchased by consumers in the forum State." World-Wide Volkswagen, 444 U.S. at 297-98 (emphasis added).

"The strictures of the Due Process Clause forbid a state court to exercise personal jurisdiction . . . under circumstances that would offend "'traditional notions of fair play and substantial justice.'"" Asahi, 480 U.S. at 113 (quoting Int'l Shoe, 326 U.S. at 316) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)). Thus, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe, 326 U.S. at 320).

- 17 -

"[M]inimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." Burger King, 471 U.S. at 477-78. "[C]ourts in 'appropriate case[s]' may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.'" Burger King, 471 U.S. at 477 (second alteration in original) (quoting World-Wide Volkswagen, 444 U.S. at 292).

In 2011, the United States Supreme Court revisited its personal jurisdiction jurisprudence in the noteworthy case of J. McIntyre Machinery, Ltd. v. Nicastro, __ U.S. __, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011). Although the decision failed to yield a majority opinion, Justice Breyer's concurring opinion, which—as the opinion setting forth the narrowest ground of decision—represents the Court's holding,[21] expounded upon familiar, but often difficult to administer, principles. Given that the decision is instructive in resolving the matter before us, we examine it in some detail.

The facts in J. McIntyre are relatively straightforward. A British

---

[21] Because the Court's plurality opinion did not garner assent among at least five justices, we must, in order to ascertain the Court's holding, determine whether the plurality opinion or the concurrence decided the case on the narrowest grounds. See, e.g., Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977). Consistent with our recent decision in AU Optronics, we conclude that Justice Breyer's concurring opinion represents the more narrow ground of decision and is, thus, the Court's holding. 180 Wn. App. at 919

manufacturer sold metal shearing machines to a United States distributor, which, in turn, marketed and sold the machines throughout the United States. 131 S. Ct. at 2786 (plurality opinion). A single machine, which had been manufactured in Britain, was sold by the United States distributor to a New Jersey company.[22] J. McIntyre, 131 S. Ct. at 2786 (plurality opinion). Thereafter, Robert Nicastro, an employee of the New Jersey company, seriously injured his hand while using the machine. J. McIntyre, 131 S. Ct. at 2786 (plurality opinion). Nicastro subsequently filed suit against the British manufacturer in New Jersey. J. McIntyre, 131 S. Ct. at 2786 (plurality opinion). The New Jersey Supreme Court held that because the manufacturer knew or reasonably should have known "that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states," New Jersey courts could, consistent with the Due Process Clause, exercise jurisdiction over the manufacturer. Nicastro v. McIntyre Mach. Am., Ltd., 201 N.J. 48, 76-78, 987 A.2d 575 (2010).

The United States Supreme Court reversed; however, the case produced no majority opinion—four justices signed Justice Kennedy's plurality opinion, two justices signed Justice Breyer's concurring opinion, and three justices signed Justice Ginsburg's dissenting opinion. While the plurality opinion and the concurring opinion relied on different reasoning, both reached the same

---

[22] Whereas the plurality opinion stated that "no more than four machines . . . ended up in New Jersey," Justice Breyer's concurring opinion stated, "The American Distributor on one occasion sold and shipped one machine to a New Jersey customer." J. McIntyre, 131 S. Ct. at 2791. As explained herein, Justice Breyer's opinion controls and, thus, we presume that only one machine entered New Jersey.

conclusion: a foreign manufacturer's sale of its products through an independent, nationwide distribution system is not sufficient, absent something more, for a state to assert personal jurisdiction over the manufacturer when only one of its products enters a state and causes injury in that state. Compare J. McIntyre, 131 S. Ct. at 2791 (plurality opinion), with Id. at 2892 (Breyer, J., concurring in the judgment).

The plurality identified the appropriate inquiry as focusing on "the defendant's actions, not his expectations." J. McIntyre, 131 S. Ct. at 2789 (plurality opinion). The plurality required evidence that the foreign defendant "targeted" the forum state in some fashion. J. McIntyre, 131 S. Ct. at 2789-90 (plurality opinion). That it was simply foreseeable that the defendant's products might be distributed in the forum state—or in all 50 states, for that matter—was insufficient. J. McIntyre, 131 S. Ct. at 2789-90 (plurality opinion). Therefore, despite evidence that the British manufacturer had targeted the United States (by virtue of utilizing a nationwide distributor), given that there was no evidence showing that the manufacturer had targeted New Jersey specifically, the plurality reasoned that New Jersey could not exercise personal jurisdiction over the manufacturer. J. McIntyre, 131 S. Ct. at 2790-91 (plurality opinion).

Justice Breyer concurred in the judgment, yet he voiced his disapproval of the plurality's "strict rules that limit jurisdiction where a defendant does not 'inten[d] to submit to the power of a sovereign' and cannot 'be said to have targeted the forum.'" J. McIntyre, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment) (alteration in original) (quoting Id. at 2788). Justice Breyer explained

that because certain issues with "serious commercial consequences . . . are totally absent in this case," strict adherence to prior precedents "and the limited facts found by the New Jersey Supreme Court" was the better approach. J. McIntyre, 131 S. Ct. at 2793-94 (Breyer, J., concurring in the judgment).

He also rejected the New Jersey Supreme Court's "absolute approach," in which "a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'" J. McIntyre, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment) (quoting Nicastro, 201 N.J. at 76-77). He disavowed this formulation as inconsistent with prior precedent.

> For one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum*, and the litigation," it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there." Shaffer v. Heitner, 433 U.S. 186, 204 S. Ct. 2569, 53 L. Ed. 2d 683 (1977) (emphasis added). It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum State. But this Court has rejected the notion that a defendant's amenability to suit "travel[s] with the chattel." World-Wide Volkswagen, 444 U.S., at 296.
>
> For another, I cannot reconcile so automatic a rule with the constitutional demand for "minimum contacts" and "purposeful[l] avail[ment]," each of which rest upon a particular notion of defendant-focused fairness. Id., at 291, 297 (internal quotation marks omitted). A rule like the New Jersey Supreme Court's would permit every State to assert jurisdiction in a products-liability suit against any domestic manufacturer who sells its products (made anywhere in the United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue.

J. McIntyre, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment) (alteration in original).

In Justice Breyer's estimation, "the outcome of this case is determined by our precedents"—in particular, World-Wide Volkswagen, 444 U.S. 286, and Asahi, 480 U.S. 102. J. McIntyre, 131 S. Ct. at 2791-92 (Breyer, J., concurring in the judgment). Justice Breyer explained that evidence of either a "'regular . . . flow' or 'regular course' of sales"[23] in the forum State or of "'something more,' such as special state-related design, advertising, advice, marketing, or anything else" was necessary in order to support New Jersey's assertion of jurisdiction. J. McIntyre, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment). Given the absence of either, Justice Breyer concluded that there was no evidence showing that the British manufacturer "'purposefully avail[ed] itself of the privilege of conducting activities' within New Jersey, or that it delivered its goods in the stream of commerce 'with the expectation that they [would] be purchased' by New Jersey users." J. McIntyre, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment) (first alteration in original) (quoting World-Wide Volkswagen, 444 U.S. at 297-98).

Justice Breyer did not offer a mathematically precise means of computing the requisite incidence or volume of sales that must occur in a forum state in order to constitute sufficient minimum contacts. Nonetheless, in seeking to ascertain a threshold above which a certain incidence or volume of sales will

---

[23] The phrases "'regular . . . flow' or 'regular course' of sales" originated from Justice Brennan's and Justice Stevens's separate concurring opinions in Asahi. 480 U.S. at 117, 122.

constitute a "regular flow" or "regular course," certain observations made by Justice Breyer are revealing.

In rejecting the New Jersey Supreme Court's "absolute approach," as irreconcilable "with the constitutional demand for 'minimum contacts' and 'purposefu[l] avail[ment],' each of which rest upon a particular notion of defendant-focused fairness," Justice Breyer was troubled by the potential for a small foreign manufacturer to be haled into court in a distant forum by virtue of a large distributor's sale of a single product made by the manufacturer.

> What might appear fair in the case of a large manufacturer which specifically seeks, or expects, an equal-sized distributor to sell its product in a distant State might seem unfair in the case of a small manufacturer (say, an Appalachian potter) who sells his product (cups and saucers) exclusively to a large distributor, who resells a single item (a coffee mug) to a buyer from a distant State (Hawaii). . . .
>
> . . . .
>
> It may be that a larger firm can readily "alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to consumers, or, if the risks are too great, severing its connection with the State." World-Wide Volkswagen, supra, at 297. But manufacturers come in many shapes and sizes. It may be fundamentally unfair to require a small Egyptian shirt maker, a Brazilian manufacturing cooperative, or a Kenyan coffee farmer, selling its products through international distributors, to respond to products-liability tort suits in virtually every State in the United States, even those in respect to which the foreign firm has no connection at all but the sale of a single (allegedly defective) good.

J. McIntyre, 131 S. Ct. at 2793-94 (Breyer, J., concurring in the judgment).

The above-quoted passage, considered in concert with Justice Breyer's application of World-Wide Volkswagen and Asahi, leads to an inference that the minimum contacts inquiry, as viewed by Justice Breyer, seeks to determine whether the incidence or volume of sales into a forum signifies something

*systematic*—informed by either the purpose or the expectation of the foreign manufacturer—such that it is fair, in light of the relationship between the defendant, the forum, and the litigation, to subject the foreign defendant to personal jurisdiction in the forum. Stated differently, if the incidence or volume of sales into a forum points to something systematic—as opposed to anomalous— then "purposeful availment" will be found.[24, 25]

C

This court's prior interpretation of J. McIntyre is consistent with the foregoing assessment. Recently, in AU Optronics, we were given occasion to interpret and apply J. McIntyre in a factual context similar to the one presented by this appeal. In AU Optronics, the Attorney General of Washington brought suit against 20 defendants, including a foreign corporation that successfully moved, on its own behalf, to dismiss the complaint for lack of personal jurisdiction. 180 Wn. App. at 908, 911-12. In asserting personal jurisdiction over

[24] The presence of state-related design, advertising, advice marketing, or anything else that could fall within that which has been described as "something more," will inform the foregoing inquiry and, in some instances, may be sufficient to sustain the exercise of personal jurisdiction.

[25] Justice Ginsburg's dissenting opinion, which was joined by Justices Sotomayor and Kagan, reasoned that the manufacturer—by virtue of "engag[ing] a U.S. company to promote and distribute the manufacturer's products, not in any particular State, but anywhere and everywhere in the United States the distributor can attract purchasers"—had purposefully availed itself of the privilege of conducting business in all states, including New Jersey. J. McIntyre, 131 S. Ct. at 2799, 2801 (Ginsburg, J., dissenting). From this reasoning it may be inferred that, even in the absence of a substantial volume of sales into a forum state, Justices Ginsburg, Sotomayor, and Kagan would still find purposeful availment in the event that a foreign manufacturer targeted a national market. It may be further deduced that the three dissenting justices in J. McIntyre would be at least as amenable as the two concurring justices, if not more so, to the notion that purposeful availment is satisfied when a plaintiff alleges that a foreign manufacturer, in targeting a national market, intended or expected that its products would be sold in one of the several states, and that such products were, in fact, sold into the forum state in substantial volume. Thus, any case in which the facts satisfied the demands of the two concurring justices would also satisfy the demands of the three dissenting justices, resulting in a majority decision, if not a unified majority view.

the foreign corporation, the Attorney General alleged that it had, in violation of the CPA, manufactured and distributed LCD panels as component parts for retail consumer goods, which were then sold by third parties in high volume throughout the United States, including in Washington. AU Optronics, 180 Wn. App. at 908-09.

After closely examining J. McIntyre, we held that the foreign manufacturer's alleged violation of the CPA "plus a large volume of expected and actual sales established sufficient minimum contacts for a Washington court to exercise specific jurisdiction over it." AU Optronics, 180 Wn. App. at 924. In so holding, we emphasized the fact that the foreign manufacturer "understood the third parties would sell products containing its LCD panels throughout the United States, including large numbers of those products in Washington." AU Optronics, 180 Wn. App. at 924. This was apparent, in part, by virtue of the fact that the foreign manufacturer "sold its LCD panels to a particular global consumer electronics manufacturer that sold products containing these panels nationwide and in Washington through national electronic appliance distribution chains." AU Optronics, 180 Wn. App. at 924.

While acknowledging that "'nationwide distribution of a foreign manufacturer's products is not sufficient to establish jurisdiction over the manufacturer when that effort results in only a single sale in the forum state,'" we concluded that "the record here shows that during the conspiracy period, various companies and retailers sold millions of dollars' worth of products containing [the foreign manufacturer's] LCD panels in Washington." AU Optronics, 180 Wn.

App. at 924-25 (quoting Willemsen v. Invacare Corp., 352 Or. 191, 203, 282 P.3d 867 (2012), cert. denied, 133 S. Ct. 984 (2013)). Consequently, as alleged "[s]ales to Washington consumers were not isolated; rather, they indicated a "'regular . . . flow'" or "'regular course'" of sales in Washington."[26] AU Optronics, 180 Wn. App. at 925 (quoting J. McIntyre, 131 S. Ct. at 2792).

Our decision in AU Optronics was based on the analysis of J. McIntyre adopted by the Oregon Supreme Court in Willemsen v. Invacare Corporation, 352 Or. 191. AU Optronics, 180 Wn. App. at 922.[27] In Willemsen, a Taiwanese manufacturer of battery chargers, CTE, supplied its products for installation in motorized wheelchairs that were built by an Ohio corporation, Invacare. 352 Or. at 194. Invacare then sold the wheelchairs throughout the United States, including in Oregon. Willemsen, 352 Or. at 194. In Oregon, between 2006 and 2007, Invacare sold 1,166 motorized wheelchairs, nearly all of which came equipped with CTE's battery chargers. Willemsen, 352 Or. at 196. After their mother died in a fire, which was allegedly caused by a defect in CTE's battery charger, the plaintiffs filed suit against CTE in Oregon. Willemsen, 352 Or. at 194.

---

[26] In dicta, we observed that the foreign manufacturer "also entered into a master purchase agreement" with another company "in which the company agreed to obtain and maintain all necessary U.S. regulatory approval." AU Optronics, 180 Wn. App. at 924. We also noted that representatives of the foreign manufacturer "met with various companies in Washington and in other states." AU Optronics, 180 Wn. App. at 924. While it is possible that these circumstances alone could have been sufficient to satisfy due process, they were not, in that instance, necessary to do so.

[27] In response to the foreign manufacturer's contention that Willemsen's reasoning conflicted with our Supreme Court's decision in Grange Ins. Ass'n v. State, 110 Wn.2d 752, we explained that the analysis in Willemsen was based upon Justice Breyer's concurring opinion in J. McIntyre, and that Grange "predates the United States Supreme Court's more recent interpretations of the federal due process clause." AU Optronics, 180 Wn. App. at 925.

Relying on Justice Breyer's concurrence in J. McIntyre, the Oregon Supreme Court determined, "The sale of the CTE battery charger in Oregon that led to the death of plaintiffs' mother was not an isolated or fortuitous occurrence." Willemsen, 352 Or. at 203. Given that "the sale of over 1,100 CTE battery chargers within Oregon over a two-year period shows a '"regular . . . flow'" or '"regular course'" of sales in Oregon," the court held that sufficient minimum contacts existed to exercise specific jurisdiction over CTE. Willemsen, 352 Or. at 203-04 (internal quotation marks omitted) (quoting J. McIntyre, 131 S. Ct. at 2792 (Breyer, J., concurring in the judgment)). "Put differently, the pattern of sales of CTE's battery chargers in Oregon establishes a 'relationship between "the defendant, the *forum,* and the litigation,'" [such that] it is fair, in light of the defendant's contacts *with* [*this*] *forum*, to subject the defendant to suit [h]ere.'" Willemsen, 352 Or. at 207 (alterations in original) (quoting J. McIntyre, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment) (quoting Shaffer, 433 U.S. at 204).

Having set forth in some detail the precedents upon which we rely in resolving this matter, we now apply them to the facts herein.

D

The Attorney General contends that Washington's exercise of jurisdiction over the Companies is consistent with due process. This is so, he asserts, because (1) the large volume of CRT products that entered Washington constituted a regular flow or regular course of sales, (2) the Attorney General's claims arose from the Companies' contacts with Washington because consumers

were injured by paying inflated prices as a result of the Companies' price-fixing, and (3) the concern for otherwise remediless consumers and the danger of insulating foreign manufacturers from the reach of Washington antitrust laws outweigh any inconvenience to the Companies. We agree.

"Although '[t]o be sure, nationwide distribution of a foreign manufacturer's products is not sufficient to establish jurisdiction over the manufacturer when that effort results in only a single sale in the forum state,'" the presence of "a large volume of expected and actual sales" establishes sufficient minimum contacts to support the exercise of jurisdiction. AU Optronics, 180 Wn. App. at 924 (quoting Willemsen, 352 Or. at 203). While the facts in this case differ from those in J. McIntyre—as well as the precedents upon which Justice Breyer relied—the reasoning set forth in his opinion therein nevertheless dictates the outcome in this matter.

As alleged, the defendants, together, exercised hegemony over a prodigious industry responsible for manufacturing and supplying critical component parts to be integrated into consumer technology products, which were ubiquitous in North America during the turn of the century. The defendants understood that third parties would sell products containing their CRT component parts throughout the United States, including large numbers of those products in Washington. Their actions were intended to and did, in fact, result in "substantial" harm to "a large number of Washington State agencies and residents."

Applying the teachings of Justice Breyer in J. McIntyre, we conclude that

the Companies, by virtue of the substantial volume of sales that took place in Washington, "purposefully availed" themselves of the privilege of conducting activities within Washington. A reasonable inference to be drawn from the Attorney General's allegations, which we treat as verities at this stage of the litigation, is that a "regular flow" or "regular course" of sales into Washington during the conspiracy period did, in fact, occur. The presence, in large quantity, of the defendants' products in Washington demonstrates that their contacts were not random, fortuitous, or attenuated. Instead, they point to a systematic effort by the defendants to avail themselves of the privilege of conducting business in Washington. Thus, Justice Breyer's concern of a small foreign manufacturer being haled into court based on an anomalous sale of one of its products by a large distributor is not implicated herein. In view of the foregoing, we conclude that the Companies purposefully established minimum contacts with Washington.[28]

"Due process also requires the [Attorney General] to show this cause of action arises from [the Companies'] indirect sales to Washington consumers." AU Optronics, 180 Wn. App. at 925. The Attorney General claims that, as a result of the defendants' price-fixing conduct, Washington State agencies and residents paid supracompetitive prices for CRT products, which resulted in injury to them. The Companies argue that consumers purchased CRT products from independent third parties. We rejected a similar argument in AU Optronics, 180

---

[28] As indicated, supra at n.24, while the presence of "something more" may be sufficient, under certain circumstances, to establish "purposeful availment," it is not necessary where, as here, a substantial volume of sales occurred in the forum.

Wn. App. at 925, and do so here.

While we conclude that the Attorney General has sufficiently alleged both that the Companies "purposefully availed" themselves of the privilege of doing business in Washington and that his cause of action "arises from" their indirect sales to Washington consumers, we must still determine whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. See Asahi, 480 U.S. at 113. We have "consider[ed] 'the quality, nature, and extent of the defendant's activity in Washington, the relative convenience of the plaintiff and the defendant in maintaining the action here, the benefits and protection of Washington's laws afforded the parties, and the basic equities of the situation.'" AU Optronics, 180 Wn. App. at 926 (quoting CTVC of Haw., 82 Wn. App. at 720).

The Attorney General alleged that the defendants manufactured, sold, and/or distributed millions of CRTs and CRT products to customers throughout the United States and in Washington during the conspiracy period. He alleged that the actions of the defendants were intended to and did have a direct, substantial, and reasonably foreseeable effect on import trade and commerce into and within Washington.

Although it may be inconvenient for the Companies to defend in Washington, this inconvenience does not outweigh the strong interest that Washington has in providing a forum in which recovery on behalf of indirect purchasers may be pursued. See AU Optronics, 180 Wn. App. at 927 (given that indirect purchasers in Washington have no private right of action, the benefits

- 30 -

and protections of Washington law favor the exercise of jurisdiction). Nor does any inconvenience outweigh the inequitable result that would occur if the Companies were insulated from liability simply because other defendants could provide sources of compensation. See AU Optronics, 180 Wn. App. at 928 ("Considering modern economic structures, it is unreasonable to expect that [a foreign manufacturer] would target Washington consumers directly.")

We hold that requiring the Companies to appear and defend in Washington does not offend traditional notions of fair play and substantial justice. The Attorney General's allegations were sufficient to withstand the Companies' dispositive CR 12(b)(2) motions and, thus, the trial court erred by dismissing the Attorney General's complaint against them.

III

The Companies seek to recover attorney fees on appeal. The Attorney General seeks reversal of the attorney fees awarded to the Companies in the trial court. Given that the Companies are no longer "prevailing parties," we reverse the award of fees in the trial court and decline to award fees on appeal.

Reversed and remanded.

Dwyer, J.

We concur:

Spearman, C.J.

Cox, J.

-31-